## J. H. STIVERS v. COMMONWEALTH.

[Abstract Kentucky Law Reporter, Vol. 6—95.]

**Self-Defense in Murder Case.**

> If one charged with murder at the time of the offense had reasonable grounds to believe and did believe that he was in danger of losing his life or of suffering great bodily harm from the deceased, then he had the right to use such means as reasonably appeared to him to be necessary to protect himself from the impending danger.

**Instruction.**

> Where the court has fully instructed the jury as to the law of murder and self-defense in such a case, it is error to instruct the jury further by selecting a few facts or rather the theory of the case relied upon by the prosecution and in effect telling the jury that the plea of self-defense had not been established. It was misleading to the jury, and especially so where the court did not follow up the instruction by an instruction embodying the theory of the defense so that one could offset the other.

APPEAL FROM BOURBON CIRCUIT COURT.

June 14, 1884.

OPINION BY JUDGE PRYOR:

The appellant, Stivers, was indicted in the Bourbon Circuit Court for the murder of W. B. Scully, the trial resulting in a verdict of manslaughter and the punishment fixed at ten years'

42

confinement in the state prison. From that judgment he has appealed.

The facts developed on the trial are in substance these: The deceased and his nephew, Gilroy, lived in the same neighborhood as the appellant and traveled the same road from their respective houses to the town of Paris. The brothers and sisters of the accused were returning home from school and were met in the road by the deceased and his nephew. The deceased attempted to stop the vehicle in which the children were and charged the brother, about eighteen years of age, with having used some insulting language to his sister in regard to a flock of turkeys, charging his sister with stealing them and using other language of a rough and blackguard nature. An apology was demanded and this young man denied time and again that he had used the language attributed to him, saying he was too much of a gentleman to insult a lady in such a manner. The denial was not accepted and the boy was told that he was a liar, when Gilroy and deceased left the buggy in which they were riding and Gilroy seized young Stivers by the neck, choking him and attempted to pull him from the wagon, while his sisters were crying and holding on to their brother to prevent it. The deceased, seeing that Gilroy could not get the boy out of the wagon, with his feet on the hub of the wheel said he could get him out; and the boy, promising to get out if they would let him go, stepped from the wagon when deceased with his fist knocked him down so as to render him unconscious, and when in that condition Gilroy attempted to hit him with a stick when the deceased told him to desist, and from the statement of Gilroy expressed himself sorry for what he, the deceased, had done. The boy during the entire difficulty persisted in saying that he had never insulted the young lady.

The father of the children had been dead about three years, and when they reached their home, all of them much distressed and weeping, and informed their brother, the appellant, then about twenty-one years of age, what had transpired, the latter said that they would go to town at once and have Scully arrested. The boy declined to go saying that he was afraid of Scully and that they might meet him on the road, also saying to his brother that Scully when the difficulty was over or during its progress remarked that the difficulty between the families was not yet over

and it had to be settled in blood. The accused then told his brother that he, the latter, could go by the railroad and meet him at a certain place, where the affidavit could be made. The accused loaded his shotgun with slugs and also his pistol, and took those weapons with him in his buggy, the pistol on his person, and proceeded at once to Paris, making inquiry as he passed the toll gate (going rapidly) if the deceased had gone home. The defense proved by Parrish certain statements made by Scully about his wanting buckshot in the afternoon the killing took place, and the commonwealth with a view of contradicting Parrish proved by Bell that deceased said he wanted the shells loaded with buckshot, and when asked by witness what he wanted with them was told by deceased "that he needed them about home; that in his absence his sister had been insulted by Sherman Stivers; that she had gone to Stivers' store after some turkeys; Stivers called her a Lexington thief, a damn bitch and said they all had been run out of Lexington; that it was the one that went to school; that he intended to see him and whip him if he had to drag him from his home and if that did not suit them he would satisfy them any way he wanted."

The commonwealth with a view of contradicting the statements of the children when they returned home, or of ascertaining what did take place between them and their brother, introduced George Lovell, who testified that Sherman told his brother that he had been slapped down by Scully and the latter told him at the time the matter was not over with and had to end in blood. The accused then said to his brother, "We'll go to town and have him arrested," and ordered Harris to hitch up his horse. The boy proposed to wait until morning and the accused said to him, "No, now's the time." Sherman said he was afraid to go, he might meet Scully. He then told his brother to go on train, that he was afraid he (Sherman) had very little of his father's courage. Accused also gave directions to the witness what to do if he did not return that night.

When the appellant reached Paris in going down Main street he met Scully and Gilroy. They were in a phaeton facing the direction from which the appellant was approaching. When appellant was in a few feet of Scully he stopped his buggy and from the statement of some of the witnesses asked if that was Scully.

The latter said "Yes," and accused said to him, "I want to see you." Scully said "All right," and got out of the phaeton with a shotgun in his hand, walked around the head of his horse, and when reaching the wheels of the buggy of the appellant and nearly between them the report of a gun was heard and Scully fell mortally wounded from a shot fired by the appellant with the shotgun he had in his buggy. The defense proves that in a few moments after the shooting and before the body of the deceased had been moved a pistol was taken from his side or near him, and the proof conduces to show that it was taken by Gilroy. The parties must have been facing each other or nearly so when the shot was fired by the accused. Gilroy says that he took no pistol from the side of Scully, and the only pistol they had was in the phaeton in his (Gilroy's) pocket. Divers witnesses say that they saw no pistol at the time or during the examination of the body, and several witnesses were introduced to controvert the statements made by the two witnesses who swear they saw the pistol. No one was anticipating any difficulty between the parties, and therefore there was nothing to attract the attention of the witnesses. The commonwealth establishes by one witness who was talking to Gilroy and the deceased at the time that he saw no demonstration by the deceased, and by Gilroy that he had the gun in his hand or by his side when Scully left the buggy, and his statement conduces to show that Scully did not take his gun with him. Other witnesses, however, for the commonwealth, say that Scully took the gun when he left the phaeton and one witness says that he picked the gun up by the side of the deceased and carried it to the store in which he was employed as clerk.

It is evident that Scully took the gun from Gilroy or his phaeton when he started towards the buggy of the accused, and Gilroy may by reason of his own knowledge of what had previously transpired been so much excited as not to realize that fact. The theory of the prosecution is that, although appellant declared when leaving home his purpose to have the deceased arrested, his intention was to take the life of the deceased, and that if such a conclusion is not authorized from the testimony still the accused is guilty of killing in sudden heat and passion and not in his necessary self-defense, and was therefore properly convicted of manslaughter.

The appearance of the brother and sisters of the appellant, and information given him by them when they reached home as to the assault on Sherman, while calculated to inflame the passions of the young man did not justify him in taking the life of the deceased or even in making an ordinary assault upon him. He had no right to take the law into his own hands for the purpose of avenging the wrong perpetrated on his brother. The courts of justice were open to him for redress, and when leaving his home with the declaration of his intention to have the deceased arrested for the offense he was pursuing the proper course and evidenced that high regard for the law that should be entertained by every good citizen.

Neither the rashness of youth nor the wrong done his brother can shield him from punishment for taking the life of the deceased unless at the time of the killing he acted in self-defense. If he had reasonable grounds to believe and did believe that he was in danger of losing his life or of suffering great bodily harm from the deceased, then he had the right to use such means as reasonably appeared to him to be necessary to protect himself from the impending danger. If he invited Scully to his buggy for the purpose of killing him he is then guilty and not entitled to a reversal.

The court told the jury that if they believed from the evidence to the exclusion of every reasonable doubt that the defendant, before the finding of the indictment, wilfully shot and killed W. B. Scully with a gun, etc., when such shooting was not necessary nor reasonably believed by the defendant to be necessary to save himself from immediate death or great bodily harm at the hands of Scully, the jury ought to find the defendant guilty—guilty of murder if the killing was done with malice aforethought, guilty of voluntary manslaughter if in sudden heat and passion and without malice. The prosecution had presented to the jury by this instruction the law of murder and manslaughter, upon which a conviction should have been had if the facts authorized it.

The accused then being entitled to an instruction as to his plea of self-defense, the jury was told that if the accused at the time he killed the deceased believed and had reasonable grounds to believe that deceased was about to take his life or inflict on him great bodily harm he had the right to use such means then and there at his command as were necessary or in the exercise of a

reasonable judgment seemed to him to be necessary to avert the impending danger, etc., and the jury should acquit him. Here was the law of self-defense plainly written, and with other instructions as to the degree of the offense and such other instructions as ordinarily follow in this character of prosecution the jury could not have been misled.

The prosecution, however, obtained an instruction No. 4 that seems to have selected the few facts or rather the theory of this case as relied on by the prosecution, that in effect told the jury the plea of self-defense had not been established. In order to avoid the plea of self-defense the jury was told, "If there was such danger and it was induced or provoked by the defendant at a time when he had no reasonable grounds to believe himself in immediate danger of death or great bodily harm at the hands of the deceased, for the purpose and with the intention of killing him and wrongfully beginning the difficulty, in which the deceased was killed, or by engaging with the deceased in mutual combat, then the defendant is not entitled to avail himself of the right of self-defense as defined by instruction No. 3." That the appellant induced the deceased to leave his phaeton and approach appellant's buggy is conceded, and but for that invitation the killing would not have taken place, and how the jury understood this instruction must be involved in doubt. They may have assumed that the invitation extended to the deceased placed him in danger, and but for that no necessity could have arisen for taking human life, or that the court believed that the invitation to engage in a mutual combat had been extended by the accused to the deceased or that the accused was in the wrong from the beginning. While the facts may not be singled out by the instruction complained of, it contains a principle or rule of law applicable to the theory of the prosecution alone, and when giving its counterpart should have been given for the defense. It is sound law but could be considered under the general instruction. The facts proved by the commonwealth sustain the rule, while those proved by the defense do not. If the purpose of the deceased to take the blood of the family or some one of them was communicated to the appellant, and his trip to town was in good faith to have the deceased arrested, and although inviting the deceased to his carriage, if not with the intent to kill him, the deceased approached him with his

gun and he believed and had reasonable grounds to believe he was in danger of loss of life or bodily harm he had the right to use such means as were necessary to avert the impending danger, and there was as much reason for embodying this theory of the defense in an instruction as there was the theory of the prosecution. Neither should have been given as the law of the case had been given the jury in the general instructions.

The instruction No. 4 was misleading, and in our opinion deprived the accused of his defense. Judgment *reversed* and cause remanded with directions to award a new trial and for proceedings consistent with this opinion.

*Offutt & Ford, G. C. Lockhart, A. Duvall, D. W. Lindsay, for appellant.*

*P. W. Hardin, for appellee.*